## CLINE AND NEWSOME *v.* GREENWOOD AND SMITH.

OFFICERS—POWER OF GOVERNOR TO APPOINT.—Under the act of 1878, providing for election of supreme and circuit judges in distinct classes, the election was postponed until the next general election. By virtue of an emergency clause, the act took effect from and after its approval by the governor. In the meantime, the offices created by the act were filled by appointment by the governor, as provided in the act. *Held*, that that portion of the act authorizing the governor to appoint the judges during the interim, was not in conflict with the constitution— that the offices came into legal existence when the act took effect, and *ipso facto* became vacant at their creation—and that an existing vacant office, without an incumbent, is vacant within the meaning of section 16, article 5 of the constitution, and can be filled by the governor by appointment.

STATUTE—CONSTITUTIONALITY OF.—Before a statute is declared void, its repugnancy to the constitution ought to be clear and palpable, and free from all doubt. The rule is rigid that every intendment should be in favor of its constitutionality.

*Geo. W. Lawson,* for appellants.

*J. A. Stratton and Thayer & Williams,* for respondents.

By the Court, LORD, J.:

This is a suit in equity to impeach and set aside a decree in equity. The decree was rendered, in a suit in equity, wherein J. W. Greenwood and Eliza J. Smith were plaintiffs, and Mary C. Cline and Olive Newsome were defendants, commenced in August, 1876, in the Marion county

court, to invalidate and set aside the will of Elizabeth J. Greenwood, and to have distribution of her estate made according to law instead of by the terms of said will. The county court decided the will to be invalid, and the defendants therein appealed to the circuit court, and a decree was rendered reversing the county court and sustaining the validity of the will. From this decree the plaintiffs appealed to the supreme court of Oregon, and at the January term, 1879, the decree of the circuit court was reversed by the decree of the said supreme court, and its mandate sent to the court below, whereby it was decreed that said will was invalid, and the same was set aside and the property of said estate was distributed according to law among the heirs of said estate, instead of by the terms of the will, among the legatees and devises thereof. To impeach and set aside this decree of the supreme court, and the mandatory decrees thereunder, is the object of the present suit.

The only point relied upon and discussed in the briefs of appellants, is, that the supreme court before whom the suit was tried at the January term, 1879, and a decree rendered annulling the will, was not organized in conformity to the constitution, because the judges who presided were appointed by the governor instead of being elected by the people. In October, 1878, an act was passed by the legislature for the election of supreme and circut judges in distinct classes, under which, the governor was authorized to appoint, and did appoint three judges of the supreme court and five judges of the circuit courts, who were to hold their offices until their successors were elected and qualified as provided in the act. (Session Laws of 1878, p. 31.) It is insisted that so much of this act as provided for the appointment of the judges of the supreme and circuit courts by the governor, until the general election next ensuing, is in direct vio-

lation of section 10, article 7 of the constitution, and, there-
fore, void.    Prior to the act of 1878, there were five judicial
districts in the state, in each of which was elected by the
voters thereof, a supreme judge, who held the circuit court
in the counties composing such district.    Originally, and on
the adoption of the constitution, there were but four of
such judicial districts, but in 1862 the legislature created
and added another judicial district to those already existing,
and provided for the election of a judge for such district,
and thus there became five supreme judges.    The constitu-
tion vests the judicial power in a supreme court, circuit
court, &c., (sec. 1, art. 7), but the judicial power applicable
to the courts above named was exercised by these five su-
preme judges in the following mode: When sitting in bank,
a supreme court, and when holding a court in any county
in their district, separately, a circuit court.    Although
called supreme judges, they were not elected by the whole
body of voters from the state, but by the voters from each
judicial district from which they were chosen.    They were
" justices of the supreme court "—five in number—and the
offices they held were of such character and like number,
for it was as justices of the supreme court that the duty of
holding a circuit court in each county in their judicial dis-
tricts devolved upon them under the constitution.    (Sec. 8,
art. 7.)    While this system of judicature was to continue,
the constitution provided, under circumstances therein
enumerated, that the number of justices of the supreme
court could be increased until the limitation of seven, and
consequently, new districts might be created, and with the
organization of such new district, another justice of the su-
preme court would be added.    Such is a brief outline of the
judicial system designed by the framers of the constitution
to exist until the population should reach two hundred

thousand, when the legislature was authorized and empowered to change or reorganize the existing judicial system, by the enactment of a law providing for the election of supreme and circuit judges in distinct classes. (Sec. 10, art. 7.) This section provides that "when the white population of this state shall amount to two hundred thousand, the legislative assembly may provide for the election of supreme and circuit judges in distinct classes, one of which classes shall consist of three justices of the supreme court, who shall not perform circuit duty, and the other class shall consist of the necessary number of circuit judges, who shall hold full terms without allotment, and who shall take the same oath as the supreme judges." This section of the constitution can only be made operative by legislative action. It is in anticipation of a condition of things, which, from the salubrity of our climate, the fruitfulness of our soil, and the extent and variety of our resources, as inducements to emigration and settlement, it was reasonable to presume would soon come to pass.

When the white population of the state is two hundred thousand, the legislative assembly is not required absolutely to provide for the election of supreme and circuit judges in distinct classes, in any event. The language of the constitution is that they *may* do it; but when done, it is not an unreasonable presumption, that that condition of things existed which authorized the legislature to exercise the power confided to them, and put an end to the existing system of judicature. At any rate, the right to exercise this power when the white population attains the requisite number, resides in the legislature, and when exercised in the mode prescribed by the constitution, the reorganization of the courts is effected; for such must be the inevitable result of any legislation making operative this section of the consti-

tution.   The former system by which supreme judges were elected by districts, and as such officers did supreme and circuit duty, must necessarily cease to exist, when the legislature passes a law providing for the election of supreme and circuit judges in distinct classes, and the constitution carries that law into effect.   The moment such law takes effect, a new supreme court is constituted, and as many circuit courts as legislative wisdom may see fit to create judicial districts.

In 1878, the legislature, conceiving the state had the requisite population, and that the time had come when the public interests required them to put an end to the existing judicial system, and to provide, in conformity with section 10, article 7, of the constitution, for the election of supreme and circuit judges in distinct classes, did enact the law heretofore referred to, entitled "An act to provide for the election of supreme and circuit judges in distinct classes," in which they provided that there shall be elected at the next general election on the first Monday of June, 1880, three justices of the supreme court, whose terms of office shall commence on the first Monday in July, 1880, etc.; that there shall be elected on the first Monday of June, 1880, a circuit judge in each of the judicial districts as they now exist in the state, whose terms of office shall commence on the first Monday in July, 1880, and continue until their successors are elected, etc., and that within twenty days from the taking effect of the act, the governor shall appoint three judges of the supreme court, and five judges of the circuit courts, who shall, within ten days after receiving notice of their appointment, qualify and enter upon the duties of their offices, and who shall continue to hold their offices until their successors are elected and qualified as provided in this act, and also provided an emergency

clause which put the act in effect from and after its approval by the governor. Here, then, is an act providing for the election of supreme and circuit judges in distinct classes. For the circuit judges, it created the judicial districts according to the boundaries as they then existed, and, when the law took effect, the office of circuit judge in each judicial district came into existence, and *ipso facto* became vacant at its creation. Nor was the legislature required in the exercise of its power in rendering operative sec. 10, of art. 7 of the constitution by legislative enactment, to pay any attention to existing judicial districts—they might have cut and carved them up in providing the "necessary number of circuit judges," as in their legislative wisdom the public exigency might have required. Instead of adopting the boundaries of the districts as already divided, they might have divided up the state into ten judicial districts in order to provide the "necessary number of circuit judges," which would have effectually blotted out every trace of the judicial districts then existing. And is it not manifest that a legislative act which should create these ten judicial districts and provide for the election of the circuit judges to hold the circuit courts in such districts, that the moment the act becomes a law, the ten judicial districts came into existence, and were legal entities, and the five old districts from which the former supreme judges were chosen, were extinguished, and there were then existing ten offices, awaiting the election of ten circuit judges, which, until such election could take place, were existing vacant offices. The creation of five judicial districts as provided in the act according to the old boundaries produced the same effect. It is true, the act provides in the meantime that the governor should fill by appointment the offices created by the act, which *ipso facto* became vacant at their creation; but as applied to vacancies

in office this precaution was wholly unnecessary, for the constitution invested him with that power. Given an existing office vacant, and under our constitution the governor is authorized to fill it. (Sec. 13, art. 5, const.) There is no basis for the distinction that it applies only to offices vacated by death, resignation or otherwise. The same is true of the supreme court created by the act. When the legislature provided in the act for the election of three supreme judges, to be elected at the next general election, and the act took effect, then there were three supreme judicial offices created, which three supreme judges were to fill when elected, and until that election took place, these offices were vacant, unoccupied. An interval necessarily existed between the taking effect of the act and the election of the judges, which, in the nature of things, rendered vacant the offices the act created. The vacancy flowed as a natural consequence of doing what the legislature had a right to do, to create a separate supreme court, and as many judicial districts as the public interests required, and to provide for the election of the judges.

Although invested with the same supreme judicial power, it is not the same supreme court which existed prior to the act of the legislature. It differs in its composition, in the number of its offices and officers, their election and duties. The fact is that the offices of the former supreme court, like the officers of that court, went out in the re-organization which the act effected. The power given by the constitution to the legislature to constitute a supreme court to be composed of three members, whose tenure of office was to be derived from the voters of the state, when exercised, put an end to the former judicial system. The old system could not exist when the new was brought into existence. By force of the act, the new supreme court was constituted

and its offices were vacant.    A legislative act, in effect providing for the election of supreme and circuit judges in distinct classes, implies the existence of the offices which they were to fill.    An office must exist before it can be provided with an incumbent by election, or otherwise.    The moment, therefore, the life of the court began by force of the legislative enactment, there came into being the offices which the three supreme judges to be elected were to fill. It is true they were elective, but they were none the less vacant after the act took effect.    Under our constitution, the governor is invested with the power to fill vacancies as well to places which have never before been occupied as to a place which has been previously occupied.    An office is just as vacant which has never been filled as an office vacant by death or resignation.    In either case, the office is empty, unoccupied, without an incumbent.    It is a mistake to suppose the filling of a vacancy in office until the period of the next general election, is opposed to the constitutional requirement that such officer should be elected.    The exercise of this power is essential to prevent great and obvious injury to the community.    Section 16, of art. 5 of our constitution is a transcript of section 18, article 5 of the constitution of 1851, of Indiana.    In *Stocking* v. *The State*, 7 Ind., 327, David M. Stocking was indicted for the murder of John Rose.    The result of his trial was a verdict of murder in the first degree, and that he suffer death, and judgment of the court was entered accordingly.    A motion for a new trial was interposed, overruled and exceptions taken, etc.

The objection made was that the court trying the cause was not organized in conformity to the constitution.    In February, 1855, an act was passed by the legislature, creating the twelfth judicial circuit, and it was claimed that this act was in conflict with section 9, article — of the constitu-

tion, which, among other things, provided that "*a judge of each circuit shall be elected by the voters thereof*." The court say: "It is objected that the judge who presided was not properly the judge of that circuit, because appointed by the governor instead of being elected by the people. The objection is not well taken. The act creating the circuit was declared in force from and after its passage, as a case of emergency. (Sec. 28, art. 4.) We lay no stress on the declaration of the legislature that there was a vacancy in the office of circuit judge of the new circuit. If there was a vacancy, it existed independent of that declaration. If there was no vacancy, that body could not create one by a declaratory enactment. The vacancy flowed as a natural consequence of doing what they had a right to do—to create a new circuit. There is no technical nor peculiar meaning to the word "vacant," as used in the constitution. It means empty, unoccupied; as applied to an office without an incumbent. There is no basis for the distinction urged, that it applies only to offices vacated by death, resignation or otherwise. An existing office without an incumbent, is vacant, whether it be a new or old one. A new house is as vacant as one tenanted for years, which was abandoned yesterday. We must take the words in their plain, usual sense. (2 R. S., pp. 339, 223, 341.) The emergency which created the office, would imply that the vacancy in the office of judge of the new circuit should be filled immediately. The 18th section, article 5, provides that the governor shall, by appointment, fill a vacancy in the office of judge of any court. We think this appointment well made under that section." This case was sustained in *Rice* v. *The State*, 7 Ind., 332; *Driskell* v. *The State*, 7 Ind., 338, and *Collins* v. *The State*, 8 Ind., 350.

In the *State of Missouri ex rel Henderson* v. *County*

*Court of Boone Co.*, 50 Mo., 324, the court say: "The next question is, was there such a vacancy in the office of judge of this court as to authorize the governor to exercise his power of appointment? The act vests the exclusive jurisdiction of probate matters in this court, and it took effect the first day of June, 1872, but postpones the election of a judge until the general election in November. Who is to transact the probate business in the meantime, unless a judge be appointed to fill the vacancy? The language of the constitution is, 'when any office shall become vacant, etc.,' the governor may fill the vacancy. This is a new office created by this act, but *ipso facto* becomes vacant in its creation. An existing office, without an incumbent, is vacant within the meaning of the constitution, and can be filled by the governor by appointment, unless an election, or some other mode is plainly indicated." (*Stocking* v. *The State*, 7 Ind., 326; *State, ex rel.* v. *Boeker*, 56 Mo. 21; *Clark* v. *Irwin*, 5 Nev., 118; *Welch* v. *Commonwealth*, 89 Penn., 424.)

In October, 1862, the legislature passed an act, entitled "An act to create the fifth judicial district, and to increase the number of supreme judges," in which it was provided, "at the first general election after the act (first Monday in June, 1864,) a justice of the supreme court shall be elected by the qualified electors of said district to serve for the term of six years, and until the commencement of such full term, the said vacant office shall be filled by the governor." During the interval between the taking effect of the act by which such judicial district was created, and the election of supreme judge at the ensuing general election, the office of supreme judge was vacant, and the governor of the state appointed the Hon. Joseph G. Wilson supreme judge during such interim, to fill the vacancy. As was said in the case of

*Stocking* v. *The State, supra,* we lay no stress on the declaration of the legislature that there was a vacancy in the office. If there was a vacancy, it existed independent of that declaration. If there was no vacancy, the legislature could not create one by a declaratory enactment. The vacancy flowed as a natural consequence of their doing what they had a right to do—to create a new judicial district. Yet the office the act created was elective, for the constitution required as imperatively in that case as in this, that the justices of the supreme court should "be chosen in districts by the electors thereof," but it was vacant, and the governor was authorized to fill it until the electors expressed their choice at the next general election. Nor was the constitutionality of that appointment, so far as we are advised, ever doubted or questioned. The people acquiesced in it, and the courts and other departments of state have recognized and treated it as legal and obligatory. At the last session of the legislature (1882) a sixth judicial district was created, and the office being vacant, the governor has filled it, until the people can select a circuit judge at the next general election. Independently of judicial authority, we have thus, for a series of years, concurring legislative expositions of the exercise of this power, which although not obligatory upon the judiciary, is nevertheless entitled to great respect, and is, at least, a strong and pursuasive argument in its support.

In *Kendall* v. *Kingston,* 5 Mass., 534, Chief Justice Parsons said: "But every department of government, invested with certain constitutional powers, must, in the first instance, but not exclusively, be the judge of its powers, or it could not act. And certainly the construction of the constitution by the legislature, ought to have great weight; and not be overruled unless manifestly erroneous." We certainly ought not to presume that the legislature was

ignorant of the right of the people to elect their judges, and of the constitutional provisions guarding that right. We should rather presume that the legislature intended that the act of 1878, to be in harmony with that right and these provisions, and if such a harmonious construction can be given to it, that construction should be applied. This, we think we have done, both upon principle and judicial authority. We do not think, therefore, that that portion of the act authorizing the governor to appoint the judges during the interim preceding the next general election, is in conflict with section 10, article 7 of the constitution investing the legislature with the power to provide for the election of supreme and circuit judges in distinct classes. But did we entertain any doubt whether the legislature had exercised its power in the mode prescribed by the constitution, we should be compelled to dissolve that doubt in favor of the constitutionality of the mode which the legislature had adopted. Before a statute is declared void, in whole or in part, its repugnancy to the constitution ought to be clear and palpable and free from all doubt. Every intendment must be given in favor of its constitutionality. Able and learned judges have, with great unanimity, laid down and adhered to a rigid rule on this subject. Chief Justice Marshall, in 5 Cranch, 128; Chief Justice Parsons, in 5 Mass., 534; Chief Justice Tilghman, in 3 S. & R., 72; Chief Justice Shaw, in 13 Pick., 61, and Chief Justice Savage, in 1 Cowen, 564, have, with one voice declared, that "it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts be considered void. The opposition between the constitution and the law should be such that the people feel a clear and strong conviction of their incompatibility with each other." The offices came into legal

existence when the act took effect, and were vacant. These, it was competent for the governor to fill. An existing office, without an incumbent, is vacant within the meaning of section 16, article 5, and can be filled by the governor by appointment. The decree of the court below is affirmed.

Decree affirmed.