No. 24,930.

JOHN E. BARRETT, *Plaintiff*, v. HUGH DUFF, *Defendant.*

No. 24,950.

L. E. GOODRICH, *Plaintiff*, v. JOHN H. CRAWFORD, *Defendant.*

No. 24,955.

M. H. RICE, *Plaintiff*, v. JESSE W. GREENLEAF, *Defendant.*

SYLLABUS BY THE COURT.

1. QUO WARRANTO—*Power of Governor not Broken by Succession to the Office.* The executive power of the governor is a continuing power, never ending and not broken by succession.

2. SAME—*Tenure of Office of Vacation Appointments made by the Governor— Vested Rights of Appointees.* Where the appointment to an office is vested in the governor, with the advice and consent of the senate, and the term of the incumbent expires during a recess of the legislature, and the governor appoints a successor to the office, *held*, that the appointment vests in the appointee a right to hold for his full term, subject only to be defeated by nonconcurrence or rejection of the senate.

3. SAME—*Limit of Power of Governor over Official Appointments once made.* Where the power of the governor has been exercised by the appointment to an office and the appointee has qualified and been vested with the powers and prerogatives of the office, neither the governor nor his successor has any further control over the appointment unless and until the appointee has been rejected by the senate.

4. SAME—*Term of Office Fixed by the State—Governor's Power of Removal.* Where the term of an office is fixed by statute the power of removal does not exist in the executive except so far as provided by statue.

5. SAME—*Power to Appoint to Office—Does not Include Power to Remove.* The executive power to appoint to office does not include the power to remove unless the tenure of office has not been declared by law.

6. SAME—*Tenure of Office of Appointee Declared by Law—Appointment may not be Revoked by the Governor.* When the appointee to an office, the tenure of which is declared by law, is commissioned by the governor and vested with the power and prerogatives of the office, neither that governor nor his successor can revoke the appointment.

7. SAME—*All Parts of Statute Construed Together.* Rule followed that one part of a statute should be construed by other parts of the same statute so that, if possible, no clause or part thereof shall be treated as superfluous, and especially when the two are parts of the same section. (*State, ex rel., v. Mitchell,* 50 Kan. 289, 33 Pac. 184; *McCreedy v. City of Fort Scott,* 113 Kan. 753.)

8. SAME—*Recess Appointments Made by Governor—Power of Senate to Investigate and Confirm or Reject.* Where statutes provide for appoint-

ment by the governor, by and with the advice and consent of the senate, and there is an absence of any constitutional or statutory provision limiting its power, the senate may, on its own initiative, without advice from the governor, institute and conduct investigations of recess appointments made by the governor and may confirm or reject them.

Original proceeding in quo warranto. Opinion filed July 7, 1923. Judgment for defendants.

*Frank Doster, Silas Porter, J. E. Addington,* all of Topeka, *S. B. Amidon,* and *S. A. Buckland,* both of Wichita, for the plaintiffs.

*James A. Troutman,* of Topeka, *Austin M. Cowan, W. E. Stanley, Warran F. Wattles,* and *Chester I. Long,* all of Wichita, for the defendants.

The opinion of the court was delivered by

HOPKINS, J.: These are original proceedings in quo warranto to determine the titles to the offices of state inspector of oils, judge of the court of industrial relations, and member of the public utilities commission. The facts briefly stated are as follows:

Harvey H. Motter was appointed state oil inspector by Governor Henry J. Allen for a term of four years, beginning March 31, 1921. His appointment was confirmed by the senate March 16, 1921. October 18, 1921, he resigned, effective November 1, 1921, and on October 18, 1921, the defendant Hugh Duff was appointed and commissioned by the governor to succeed Mr. Motter for the unexpired term ending March 31, 1925. November 1, 1921, Mr. Duff qualified and entered upon his official duties. He has performed such duties at all times since that date.

On January 27, 1922, John H. Crawford was, by Governor Allen, appointed and commissioned as a judge of the court of industrial relations for the term beginning February 1, 1922, and ending February 1, 1925. He duly entered upon the duties of such office and has performed them since that time.

On March 20, 1922, Jesse W. Greenleaf was, by Governor Allen, appointed and commissioned as a member of the public utilities commission for the three-year term from March 18, 1922, to March 18, 1925. He duly entered upon the duties of such office and has so continued.

On January 9, 1923, the legislature convened, and on January 16 following, in regular session of the senate, a motion was adopted that the senate consider recess appointments. The appointments of Duff, Crawford and Greenleaf were referred to a senate committee.

On February 21, 1923, Governor Jonathan M. Davis transmitted the name of the plaintiff John E. Barrett to the senate as state inspector of oils for the unexpired term for which Duff had previously been appointed.

On March 6, 1923, Governor Davis transmitted to the senate the name of the plaintiff Lee Goodrich as a member of the court of industrial relations for the unexpired term for which Crawford had previously been appointed.

On March 16, 1923, Governor Davis transmitted to the senate the name of the plaintiff M. H. Rice as a member of the public utilities commission for the unexpired term for which Greenleaf had previously been appointed.

On February 22, 1923, Governor Davis advised Duff, by letter, that he had revoked and canceled his appointment as state inspector of oils. On March 6, 1923, the governor conveyed like information to Crawford and Greenleaf.

On March 7, the senate, in executive session, confirmed the appointments, respectfully, of Duff, Crawford and Greenleaf to the offices and for the terms for which they had been appointed.

March 1, 1923, Governor Davis issued a paper in form and with intent to commission Barrett state oil inspector. He issued a like paper to Goodrich and Rice March 24, 1923. The cases have been submitted together, and will be so considered. They involve consideration of several questions. The plaintiffs contend that under laws providing for appointments with the advice and consent of the senate, the required acts and necessary order of their sequence are: (a) nomination by the executive, communicated directly to the senate; (b) consent by the senate; (c) appointment by the executive to be evidenced only by a commission to the appointee; that, unless and until appointments have been made in such order and sequence, those holding the respective offices may be removed at the pleasure of the governor.

The defendants contend that plaintiffs' construction of the statutes under consideration is erroneous, due to a failure to distinguish between the procedure provided by the constitution of the United States and that provided by the statutes of Kansas; that there is no provision of the constitution of Kansas and no statute relating to the offices in controversy which requires, or contemplates a so-called nomination; that "tenure of office" means the term of office and refers to the office itself, and not the person who happens

to hold it; that a portion of the term cannot be different from the whole term of which it is a part; that the governor, having exercised his power of appointment, and vested the defendants with the pre-rogatives of office, cannot revoke or withdraw the appointments; and that he has no authority, without cause, to summarily remove the defendants from office.

1. We may first consider whether the action of Governor Allen in naming and commissioning defendants Duff, Crawford and Green-leaf to their respective offices was, in each case, merely a nomination, or an appointment. The supreme executive power of the state is vested in the governor. (Const. art. I, § 3.) This executive power is continuous—never ending. It knows neither names nor persons. It began with the first governor, has continued ever since, and will continue unbroken so long as the constitution exists.

It follows that, in respect to the offices in question, Governor Davis had the same power and no greater power of removal than that which would have been possessed by Governor Allen had he remained in office. It is strongly urged by the plaintiffs that the three appointments by Governor Allen were not effective until they were communicated by the governor directly to the senate and the senate had consented thereto; that the appointments were, in effect, nominations only which could be withdrawn, and, inasmuch as they were not communicated to the senate by the governor, the senate had no power to consider them; that it was, therefore, with-in the power of Governor Davis to remove the defendants; that his notification of removal created vacancies in the respective offices and that the plaintiffs, by virtue of his commissions, are entitled thereto.

An examination of section 2, of article II, of the constitution of the United States, together with certain provisions of the Kansas con-stitution and the sections of the statute having to do with the appointment of the respective offices in controversy, is necessary to an understanding of the issues.

Section 2, of article II, of the constitution of the United States is as follows:

"He, (the president) shall have power, by and with the advice and consent of the senate, to make treaties, provided two-thirds of the senators present concur; and he shall nominate, and by and with the advise and consent of the senate, shall appoint ambassadors, other public ministers, and consuls, judges of the supreme court and all other officers of the United States, whose appointments are not herein otherwise provided for and which shall be

established by law. . . . The president shall have power to fill up all vacancies that may happen during the recess of the senate by granting commissions which shall expire at the end of their next session."

The Kansas constitution has these provisions:

"All officers whose election or appointment is not otherwise provided for shall be chosen or appointed as may be prescribed by law." (Art. 15, § 1.)

"It [the legislature] shall have the power to provide for the election or appointment of all officers and the filling of all vacancies not otherwise provided for in this constitution." (Art. 2, § 19.)

"Tenure of any office not herein provided for may be declared by law. When not so declared such office shall be held during the pleasure of the authority making the appointment; but the legislature shall not create any office, the tenure of which shall be longer than four years." (Art. 15, § 2.)

The Kansas statute relating to appointment of oil inspector, being section 2, of chapter 200 of the laws of 1913, section 5011 of the General Statutes of 1915, is as follows:

"The governor shall, on or before the first day of April, 1913, and every four years thereafter, appoint a suitable person who is a resident of this state, and not interested in manufacturing, dealing or vending any of the illuminating or heating oils specified in section 1 of this act, as state inspector of oils, whose term, when confirmed by the senate, shall be for four years from April 1, 1913, and until his successor is appointed and qualified, unless sooner removed by the governor; and he may be removed at any time for cause."

The statute relating to the appointment of judge of the court of industrial relations, being section 1 of chapter 29 of the Laws of 1920, is as follows:

"There is hereby created a tribunal to be known as the Court of Industrial Relations, which shall be composed of three judges who shall be appointed by the governor, by and with the advise and consent of the senate. Of such three judges first appointed, one shall be appointed for a term of one year, one for a term of two years, and one for a term of three years, said terms to begin simultaneously upon qualification of the persons appointed therefor. Upon the expiration of the term of the three judges first appointed as aforesaid, each succeeding judge shall be appointed and shall hold his office for a term of three years and until his successor shall have been qualified. In case of a vacancy in the office of judge of said Court of Industrial Relations the governor shall appoint his successor to fill the vacancy for the unexpired term."

The statute relating to the appointment of public utilities commission, being section 1, of chapter 260 of the Laws of 1921, is as follows:

"A Public Utilities Commission is hereby constituted and created, which

shall be composed of three commissioners, who shall be appointed by the governor, by and with the advice and consent of the senate. Of such three persons first appointed, one shall be appointed and designated to serve for a term of one year, one for a term of two years, and one for a term of three years, said terms to begin upon the qualification of the persons appointed thereto. Upon the expiration of the terms of the three commissioners first to be appointed, as aforesaid, each commissioner shall be appointed and shall hold his office for a term of three years and until his successor shall have been appointed and qualified. In case of a vacancy in the office of any commissioner, the governor shall appoint his successor to fill the vacancy for the unexpired term."

It is apparent that appointments are made in two entirely different ways. Under the constitution of the United States the president sends his nominations to the senate. If the senate consents the president then appoints. Except in article 7, referring to trustees of benevolent institutions, Kansas has no constitutional provision comparable to article II, section 2 of the constitution of the United States. There is no constitutional provision in Kansas, and no statute which applies to the offices in controversy which first requires a nomination by the governor. Under the Kansas constitution and statutes the appointments to the offices in controversy are made by the governor before the senate acts.

The federal statute provides for granting commissions to fill vacancies occurring during a recess of the senate, expiring at the end of the next session. The statutes here involved provide for appointments to fill vacancies for unexpired terms, and provide that appointees shall hold until successors are qualified. If an appointment to fill a vacancy occurring during a recess of the senate were a mere nomination, which vested no title to the office until the senate acted, an incumbent whose term expired during a senate recess could hold over under the statutory provision for holding until a successor was confirmed and qualified.

Both parties support their contentions by substantial authority. The plaintiffs cite various cases based on and which construe and interpret statutes where nominations preceding senatorial action are required. These are similar to the requirements of the federal constitution. They rely on *Marbury v. Madison*, 1 Cranch 49, 2 Law Ed. 60—a case in which Chief Justice Marshall wrote one of the most important decisions in the judicial history of this country. He was dealing, however, with the provisions of the constitution of the United States which requires a nomination before senatorial

action, as distinguished from the Kansas statutes under which completed appointments, so far as the governor is concerned, are submitted to the senate for its approval or rejection. It might well be said that the logic and reasoning of Chief Justice Marshall supports the contention of the defendants in the instant case. The principal question there decided was that the executive, having once completed the last act which he had authority to perform, could not thereafter revoke that act. In the instant case it may be said that the governor, having the power and authority to appoint the defendants, and having so appointed and commissioned them, and they having become vested with the powers and pre-rogatives.of the respective offices, the governor was powerless to remove them or to create vacancies in the offices which they held except by a lawful proceeding and for cause.

Plaintiffs also cite a number of authorities to sustain the doctrine that an out-going executive cannot forestall his successor in his prerogative to make his own appointments. These cases have no application to the controversy here for the reason that the terms began, and a large portion of them was actually served, during the administration of the governor making the appointments.

Plaintiffs place great reliance on the case of *The State, ex rel., v. Breidenthal,* 55 Kan. 308, 40 Pac. 651, which was an action to de-termine the title to the office of bank commissioner. The legislature of 1891 passed an act for the organization of banks and providing that the governor should appoint, by and with the advice and consent of the senate, a bank commissioner whose term of office should be four years. The act made no provision for the filling of vacancies. On March 21, 1891, Charles F. Johnson was appointed by the gov-ernor, but the senate not being in session, the appointment was not confirmed. He qualified, took possession of the office and performed the duties until February, 1893, when John W. Breidenthal was appointed by the governor for a four year term and his appointment confirmed by the senate. Four years from the time that Charles F. Johnson was appointed, the senate not being in session, the governor appointed C. S. Jobes to the office of bank commissioner. There was no claim that Breidenthal had resigned, been removed, had forfeited or surrendered his office and the court held, by a majority opinion, that Breidenthal's term did not expire until 1897, and as between him and Jobes, judgment was rendered in favor of Breidenthal. The analogy sought to be applied by plaintiffs in these cases to the

Breidenthal case is that the original appointment of Johnson, not having been confirmed by the senate, was provisional or a temporary appointment and subject at any time to revocation by the governor. The decision in the Breidenthal case was by a divided court which, at that time, was composed of three justices. While the judgment rendered was in favor of Breidenthal, no two justices concurred in the same view. Justice Johnston wrote the majority opinion for the other two justices, but also wrote a dissenting opinion. While justices Allen and Martin agreed on the result, they did ·not agree on a principle of the law as a basis for the result. Under the practice of the court to assign cases before consultation, what occurred in the Breidenthal case is perfectly apparent. What appears as the majority opinion expressed the views of Chief Justice Martin and Justice Allen at the consultation. When the opinion was written and came to the chief justice for inspection, he withdrew from it, and wrote an opinion of his own. Therefore there was no opinion of the court in the Breidenthal case establishing any principle of law. It cannot be regarded as an authority. If, when Breidenthal's appointment was transmitted by the governor to the senate, the senate had proceeded to confirm Johnson, who had previously been appointed, the situation would have been analogous to the instant cases. It would have been equivalent to a rejection of the appointment of Breidenthal. However, in that case the senate confirmed Breidenthal, which was equivalent to its rejection of Johnson. The plaintiffs here are not in the same situation as was Breidenthal. He was appointed, confirmed by the senate, and invested with the powers and prerogatives of the office. The plaintiffs here have never been confirmed by the senate, have never been invested with the powers and prerogatives of the office, and two of them do not even have commissions which have been lawfully attested.

2. The defendants each hold a commission signed by the governor and attested by the secretary of state. They have been confirmed by the senate. The plaintiffs have not been confirmed by · the senate, and, in cases of Rice and Goodrich, their commissions have not been attested by the secretary of state. The defendants contend that there is a presumption that they, being incumbents, possess the legal qualifications to hold their respective offices, and being in possession of the offices, they have the right to hold them until someone with a better title demands possession.

In *Newman v. The United States,* 43 App. D. C. 53, it was held:

"Mere possession of an office, accompanied by a commission from the proper appointing power, creates a presumption that the incumbent possesses the legal qualifications to hold the office."

In *Dorain v. Walters,* 132 Ky. 54, 116 S. W. 313, it was said:

"One who sues to recover a public office has the burden of proving every fact essential to show his title, his recovery depending upon the strength of his own title and not the weakness of his adversary's." (Syl. ¶ 7.)

In *Wootton v. Wheeler,* 149 Ky. 62, 147 S. W. 914, this language was used:

"In an action by one to recover office, his legal right to the office must affirmatively appear. That is, he must make out his own case and establish title to the office in himself. He has no right to appear for the state by an action in his own name [to] show that the incumbent is holding an office to which he is not entitled when he, the plaintiff, has no claim to it himself." (p. 64.)

The constitution of the state of South Dakota provided for a board of regents of education appointed by the governor and confirmed by the senate. In the case of *State, ex rel., v. Finnerud,* 7 S. D. 237, 64 N. W. 121, it was held:

"There being no provision for filling vacancies, in article 14 of the constitution, creating a board of regents of education, nor in the act of the legislature enacted to carry into effect that article, a vacancy in such board can only be filled by the governor, pursuant to the provisions of section 8, art. 4, of the constitution.

"By that section, which reads as follows: 'When any office shall, from any cause, become vacant and no mode is provided by the constitution or law for filling such vacancy, the governor shall have the power to fill such vacancy by appointment,' the power of the governor under such conditions to fill a vacancy, is for the unexpired term of the member whose place the appointment is made to fill.

"When a vacancy is filled by appointment by the governor under the provisions of that section, no confirmation of the appointment by the senate is required." (Syl. ¶¶ 1, 2, 3.)

In *People v. Addison,* 10 Cal. 1, it was said:

"Where the appointment to an office is vested in the governor with the advice and consent of the senate, and the term of the incumbent expires during the recess of the senate, the governor has a right to fill such vacancy, and his appointment vests in the appointee the right to hold and discharge the duties of such office for the full term, subject only to be defeated by the nonconcurrence of the senate." (Syl.)

3. With respect to the state oil inspector, the statute makes no specific provision for the filling of a vacancy; however, the consti-

tution requires that the governor shall see that the laws are faithfully executed. The law contemplates, and the dispatch of public business requires, that the office be filled. It is universally conceded that it was within the power of the executive to fill the vacancy, and the general rule, supported by the great weight of authority is, that the executive may fill the vacancy for the unexpired term. Section 2, of article 15, of the constitution, provides that the tenure of any office not therein provided may be declared by law. When not so declared such office shall be held during the pleasure of the authority making the appointment. The legislature, by enacting section 5011 of the General Statutes of 1915 provided a definite tenure of office, of four years. "The word 'tenure' when used in connection with the expression 'tenure of office' means the term of office." (*Territory v. Ashenfelter,* 4 N. M. 93, 12 Pac. 879.) "The words 'term of office' [as used in the constitution in reference to the duration of an appointment] refer to the tenure or duration of the office and not the incumbent." (*Jameson v. Hudson,* 82 Va. 279, syl. ¶ 1.) "The word 'term' when used in reference to the tenure of office ordinarily refers to a fixed and definite time and does not apply to an appointive office held at the pleasure of the appointive power." (*Hale v. Bischoff,* 53 Kan. 301, 36 Pac. 752; *Field v. Malster,* 88 Md. 691, 41 Atl. 1087; *Crovatt v. Mason,* 101 Ga. 246, 28 S. E. 279.) Upon the resignation of Motter, Duff was appointed and commissioned by the governor for the unexpired term. He stepped into Motter's shoes. He became vested with all of the prerogatives and powers which had attached to Motter and could not be removed except by lawful proceeding and for cause. (*Lease v. Freeborn,* 52 Kan. 750, 35 Pac. 817.)

In *Wilson v. Shaw,* 194 Ia. 28, 188 N. W. 940, it was said:

"The constitutional term of a district judge is a distinct thing or entity. An unexpired term can be predicted only on a pre-existent term of which it is a part. The *term* lives on even though the *incumbent* resigns, is impeached, or dies. Personality has nothing to do with the question, nor is a term within the meaning of the constitution 'the period of a judge's service.' It is axiomatic that the whole is equal to the sum of its parts, and that the part is never equal to or greater than the whole. This is a postulate of logic as well as of mathematics. . . . It is quite generally held that a vacancy in office is within *the term,* and not in *the office.* It is the term which survives. The constitution of this state fixes that term, and its beginning and ending. This is an expressed definition of the word *term,* and no implied limitation can exist. Furthermore, our statutes contain the same language and refer to a *full term* and *four-year term* and *fixed term.* . . . When

a person is appointed to fill a vacancy for an unexpired term, the unambiguous meaning is that he is to hold for the same term as the person whose place he takes. *Pruitt v. Squires,* 64 Kan. 855, 68 Pac. 643; *Ash v. McVey,* 85 Md. 119, 36 Atl. 440; *State v. Howell,* 59 Wash. 492, 110 Pac. 386; 50 L. R. A., n. s., 336, and note." (pp. 33, 36.)

In *Sheen v. Hughes,* 4 Ariz. 337, 40 Pac. 679, it was said:

"The person appointed to fill an office made vacant, after qualifying, possesses all the rights, etc., of the officer whose place he takes. That which is surrendered by the one is gained or acquired by the other. The one loses the office for the remaining or unexpired portion of the term, and the other acquires, by appointment, that which is surrendered." (p. 343.)

4. With respect to the public utilities commission and the court of industrial relations, the legislature made provision for a succession in office of the incumbents each year. The utilities commission is a body of experts. (*Railroad Co. v. Utilities Commission,* 95 Kan. 604, 148 Pac. 667.) The succession of its members is so provided that it will be a continuing body, that a majority of its members may at all times be men of experience. It requires that three persons shall be appointed and designated to serve, respectively, one for one year, one for a term of two years, and one for a term of three years; that on the expiration of the terms of the three first appointed, one successor shall be appointed and hold his office for a term of three years, and until his successor shall have been appointed and qualified, and in case of a vacancy in office, the governor shall appoint to fill the vacancy for the unexpired term.

It is necessary to give force, if possible, to all provisions of the statute. The requirement "that on the expiration of the terms of the three first appointed, one successor shall be appointed and hold his office for a term of three years" means that the governor, on the expiration of the term, shall at once appoint, in order that there be no vacancy in the office. Logical reasoning cannot interpret the language to mean that no appointment was to be made until the next convening of the senate.

"It is a uniform rule of construction that one part of a statute should be construed by other parts of the same statute, so that, if possible, no clause or part thereof shall be treated as superfluous, and this rule must especially be followed when the two are parts of the same section." (The *State, ex rel., v. Mitchell,* 50 Kan. 289, syl. ¶ 1, 33 Pac. 104; *McCreedy v. City of Fort Scott,* 113 Kan. 753.)

The statute also provides that "in case of a vacancy in the office of any commissioner, the governor shall appoint his successor to

fill the vacancy for the unexpired term." There is substantial authority to the effect that a vacancy may exist for the entire term. It is not necessary to here discuss or pass upon that phase of the question. The legislature undoubtedly had in mind that efficient public service could best be secured by placing these incumbents beyond the whim and caprice of the appointing power.

The power vested in the governor to appoint may be exercised only when certain conditions exist. (1st) By the expiration of a term, or (2d) a vacancy which might be created by death, resignation or by lawful removal from office. When a term expires, the governor has authority to appoint for a term of three years. Whenever the expiration of a term occurred it became the duty of the governor to appoint for such term. He could not postpone his act. He could not refuse to perform his duty under the plain intent of the law. (*State, ex rel., v. Henderson*, 4 Wyo. 535, 35 Pac. 517.) Consequently, the appointment made by him at that time was made pursuant to the authority given him under the statute.

In *State, ex rel. Sikes v. Williams*, 222 Mo. 268, 121 S. W. 64, it was said in the headnote:

"A statute creating an office to be filled by appointment made by the governor, with the advice and consent of the senate, which provides for the first appointment at a time when the senate is not in session, contemplates that, on the expiration of the term of an incumbent, the governor may make an appointment and that the senate will act thereon when the General Assembly meets in session and the appointee holds the office until the senate passes adversely on the appointment."

In the opinion it was said:

"The general assembly provided for the first appointment to be made at a time when the senate would not be in session. It must have known that the senate would not be continuously in session, and would not likely be in session at the time, when further appointments were made. The law contemplates that such appointments shall be made at the proper time, and that the senate will act upon the appointment at the next session thereafter. The law does not contemplate that there can be no occupant of the office until both the governor and senate have acted. Were that true, in case of the death of an occupant at a time when the senate was not in session, the business of the office would have to cease until the senate met. Such was never in the minds of the members of the general assembly. The very fact that the law itself provided for the first appointment to be made at a time when it was not contemplated that the general assembly would be in session is strongly indicative of the legislative intent. We are unwilling to give the statute now under consideration an interpretation which would manifestly conflict with the clear intention of the lawmaking power and absolutely deprive the gov-

ernor of the power to discharge the administrative duties incumbent upon him by reason of such enactment. Laws must be given a reasonable construction, keeping in view the purposes of, as well as the circumstances surrounding their enactment. Giving to this law such a construction, it must be held that the legislative intent was to authorize the governor to make appointments to this office at such times as vacancies occurred, therein, and that the consent of the senate would be given or refused at the next succeeding meeting of that body. In the meantime, such appointee, after having otherwise qualified under the act, is entitled to the office until such a time as the senate may pass adversely upon his appointment. Should the senate refuse to confirm, the governor would then have to appoint another." (p. 283.)

5. The question is propounded, whether or not plaintiffs have shown any legal right to the offices in controversy. Their names were transmitted by Governor Davis to the senate for the respective offices. Two contingencies must exist in order for them to succeed: First, there must have existed vacancies in the respective offices, second, they must have received valid appointments. An office may not be filled by a new incumbent until it is vacant. An office is not vacant so long as it is supplied in the manner provided by the constitution or law with an incumbent who is legally qualified to exercise the power and perform the duties which pertain to it. It is vacant when it has no incumbent authorized to perform its functions. (*State v. Rhame*, 92 S. C. 455, 75 S. E. 881; *State, ex rel. Carson v. Harrison*, 113 Ind. 434, 16 N. E. 384; *Advisory Opinion to Governor*, 67 Fla. 423; *State, ex rel., v. Finnerud*, 7 S. D. 237, 64 N. W. 121.)

The sending of the names of the plaintiffs to the senate by Governor Davis did not operate to create vacancies. The appointing power had already exhausted its prerogatives. The offices in question were filled by incumbents when Governor Davis transmitted the names of plaintiffs to the senate. The power of removal from office is not incident to the power of appointment where the term of office is fixed by statute. The power of the governor to make a valid appointment does not arise until there is a vacancy in fact. The existing title of an incumbent cannot be extinguished or affected by the erroneous judgment of the executive that the office is vacant.

In *State, ex rel. Carson v. Harrison*, 113 Ind. 434, 439, 16 N. E. 386, the court said:

"The word 'vacancy,' as applied to an office, has no technical meaning. An office is not vacant so long as it is supplied in the manner provided by the constitution or law, with an incumbent who is legally qualified to exercise the

powers and. perform the duties which pertain to it; and conversely it is vacant in the eye of the law whenever it is unoccupied by a legally qualified incumbent who has a lawful right to continue therin until the happening of some future event."

In *State, ex rel., v. Henderson,* 4 Wyo. 535, 35 Pac. 520, the court said:

"There. would be no sense in the position that a vacancy could be created by an attempt to fill a vacancy, nor in the view that one appointee to fill a vacancy could be succeeded by another to fill the same vacancy, where the provisional appointment is made from the same source. The vacancy is already filled by the governor's appointment, and there is no reason why the appointee should be displaced by one appointed by a succeeding governor. Such a succession in office is not contemplated by the constitution or by the statue." (p. 546; see, also, *Borton v. Buck,* 8 Kan. 302, 313; *The State, ex rel., v. Board of Education,* 106 Kan. 863, 189 Pac. 915; *Wetherbee v. Cazneau,* 20 Cal. 503; *People v. Mizner,* 7 Cal. 519; *People v. Addison,* 10 Cal. 1; *Territory v. Ashenfelter,* 4 N. M. 93, 12 Pac. 879; *Klock v. Mann,* 16 N. M. 744, 114 Pac. 362; *Speed v. Common Council of Detroit,* 97 Mich. 198, 56 N. W. 570; *State, ex rel., v. Henderson,* 4 Wyo. 535, 35 Pac. 517; *Sewell v. Bennett,* 187 Ky. 626, 220 S. W. 517.)

In *People v. Mizner,* 7 Cal. 519, it was said:

"Where the appointment to an office is vested in the governor, with the advice and consent of the senate, and the term of the incumbent expires during a recess of the legislature, and the governor appoints a successor to the office; *held,* that there has been no vacancy in office and that this appointment vested in the appointee a right to hold for his full term, subject only to be defeated by the non-concurrence of the senate. . . .

"The power of the governor being exercised, he had no further control over the office until the appointee had been rejected by the senate.

"Where the term of an office is fixed by the constitution, or the statute, the power of removal does not exist in the executive."

6. What has been stated in reference to the public utilities commission applies with like effect to the court of industrial relations. When a term had expired in 1922, it became the duty of the governor, under the constitution and laws, to appoint a judge of the court of industrial relations and a member of the public utilities commission. When he had appointed and commissioned Crawford and Greenleaf to their respective offices and they had become invested with the powers and prerogatives thereof, the governor had exercised the constitutional power of appointment. No further right to exercise the executive function of appointment thereunder exists until there is again the happening of contingency specified by law.

In *Marbury v. Madison,* supra, it was said:

"Some point of time must be taken when the power of the executive over an officer, not removable at his will, must cease. That point of time must be when the constitutional power of appointment has been exercised. And the power has been exercised when the last act required from the person possessing the power has been performed. This last act is the signature of the commission." (1 Cranch, 49.)

7. The power of the governor, having been exercised, he had no further control over the respective offices unless and until the appointees had been rejected by the senate. If Governor Davis had advised the senate of the facts existing in the respective cases: that Duff had been appointed state oil inspector to succeed Motter, resigned, and that Greenleaf and Crawford had, since the last session of the senate, been appointed to their respective offices; that he desired the senate to reject them; and if the senate had rejected the appointments of the defendants, their offices would thereupon have become vacant and it would have been within the power of the governor to appoint persons to fill the respective offices. This, however, did not occur. The governor proceeded upon the erroneous theory that, inasmuch as the defendants had not already been confirmed by the senate, it was within his power to revoke their appointments and summarily remove them from office. The senate, on January 16, 1923, entered upon the consideration of the names of defendants as appointees to their respective offices. This procedure was usual and customary. The only element lacking in the consideration of such recess appointments was the fact that the governor, in this instance, failed to transmit to the senate the names of the defendants as having been appointed. The senate, after due consideration, confirmed the appointments of the defendants, which was, in effect, a rejection of the appointees of Governor Davis—the plaintiffs herein. The plaintiffs deny any force or validity to the action of the senate in considering and confirming the appointments of defendants because of the failure of the executive to directly transmit the names of defendants. No good reason is advanced why the senate could not consider such recess appointments without such direct word from the executive. Judicial notice or knowledge is the cognizance of certain facts which judges and jurors may properly take and act upon without proof because they already know them. Judicial notice means that the court will bring to its aid and consider, without proof of the facts, its own knowledge of those matters of public concern which are known to all well informed persons. Legislative

Barrett v. Duff.

notice is far broader than judicial notice. (23 C. J. 58.) The legislative department is equipped to deal with any condition, general or special, however manifested or brought to the knowledge of the law-making power. The mass of individual legislation found among the statutes of all the states demonstrates this legislative attribute. (*People v. Goldberger*, 163 N. Y. Supp. 663.) The offices in controversy are all located in the capitol building in which the senate holds its deliberations. They are important departments of the state government. The senate may, and often does, have official business with them. It receives reports from them. It considers the service which the departments are, by law, required to perform. It considers the extent of such service and its requirements. It considers and passes appropriations in order that they may lawfully and properly function. Under all the circumstances, the senate cannot shut its eyes to the facts as to whether the respective offices are filled; whether they are functioning under the law, or whether there is a vacancy therein. The governor's communication sending the appointment to the senate raises the question: What is the status of the office to which the appointment refers? That question the senate is obliged to determine for itself, and to make its own investigation in order to discharge its duty. If the investigation reveals the fact that the governor has already made an appointment of an officer who has qualified, is in possession, is discharging the duties, and is receiving the emoluments of the office, the senate must determine the course it will persue, in the light of that fact. The senate, which has official knowledge of all of the acts of another state department, may not close its eyes to an existing fact, merely because the executive has failed to transmit a communication giving it the advice. The fact that the senate is called upon to consent to or confirm appointments presupposes an investigation upon which to base its judgment as to whether or not it should confirm or reject the named appointee. It is a matter of common knowledge that the senate of Kansas, likewise the senate of the United States, may, and frequently does, investigate the character, fitness and ability of the appointee submitted for its consideration. The senate must be permitted to investigate on its own initiative and without communication from the governor, the status of offices; otherwise the governor could fill and refill them at his pleasure by simply failing to advise the senate. No other branch of the

government exercises the power of investigation to the same degree as does the legislative branch. The investigation by the senate brought before it the records of the secretary of state showing the appointments of the defendants. We conclude that the senate did not go beyond its powers in making the investigation concerning the offices held by the defendants, and having satisfied itself, that it could properly exercise its judgment thereon. While it is the usual and customary courtesy of the executive to transmit such facts to the senate, we believe it the better view to hold that the senate may, on its own initiative, if it so desires, ascertain the facts upon which to base its deliberate and final judgment in confirming or rejecting appointees of the governor.

8. We conclude that the defendants were legally appointed to their respective offices at a time when the appointing power had authority to act and their appointments have been confirmed by the senate; that no vacancy existed in the respective offices at the time of the attempted appointment of the plaintiffs by Governor Davis; that it was not within the power of Governor Davis to create vacancies by revoking or canceling the commissions or appointments of the defendants; that the defendants do not hold such offices at the will of the governor; that they could not be removed except for cause and by proper proceedings; that the executive power of the governor is a continuing power not broken by succession; that when the appointee to an office, the tenure of which is declared by law, is commissioned and vested with the power and prerogatives of the office, neither the governor nor his successor can revoke the appointment; that the appointee holds the office for the remainder of the term unless rejected by the senate, dies, resigns or is removed for cause by proper proceedings; that there is no provision in our constitution or laws requiring a nomination of the defendants by the governor to the senate before appointment; that the senate was not required to wait for advice from the governor before considering such recess appointments but was entirely within its power in making investigation and basing its judgment of confirmation on the facts ascertained.

Judgment will be awarded in favor of the defendants.

Dawson, J. (concurring in part and dissenting in part): I concur in the result in case No. 24,930 but dissent from the judgments in cases No. 24,950 and No. 24,955 and from those parts of the opinion which necessarily lead thereto.

Barrett v. Duff.

HARVEY, J. (concurring in the result in No. 24,930, and dissenting in Nos. 24,950, 24,955.) : In the matter of executive appointments requiring the confirmation of the senate there is no reason for making a distinction between the so-called federal rule and the rule applicable in this state, for the simple reason that no practical difference exists, except in one material respect, which will be later noted. The pertinent portion of the federal constitution reads:

"He [the president] shall have power, by and with the advice and consent of the senate, to make treaties, provided two-thirds of the senators present concur and he shall nominate and by and with the advice and consent of the senate shall appoint ambassadors, other public ministers and consuls, judges of the supreme court and all other officers of the United States whose appointments are not herein otherwise provided for, and which shall be established by law. . . . The president shall have power to fill up all vacancies that may happen during the recess of the senate by granting commissions which shall expire at the end of their next session." (Art. 2, § 2.)

It is conceded by defendants in their brief that under this constitutional provision "where the executive power nominates and by and with the advice and consent of the senate appoints, the appointment is a conjunctive act and must be made by the two coördinate powers acting together upon a nomination previously submitted by the president." Under this provision it has been the practice for the president to send nominations to the senate for their action and, if approved, for him then to issue the commissions. Under that practice the president may withdraw any nomination submitted to the senate before it is acted upon and submit another name, or where an appointment has been made by him in the recess of the senate, he may nominate another person to the senate for appointment.

The portion of our constitution pertaining to appointments by the governor by and with the advice and consent of the senate, and the only provision of our constitution mentioning this class of appointments, reads as follows:

"Institutions for the benefit of the insane, blind, and deaf and dumb, and such other benevolent institutions as the public good may require, shall be fostered and supported by the state, subject to such regulations as may be prescribed by law. Trustees of such benevolent institutions as may be hereafter created, shall be appointed by the governor, by and with the advice and consent of the senate; and upon all nominations made by the governor, the question shall be taken in yeas and nays, and entered upon the journal. (Art. 7, § 1.)

"A penitentiary shall be established, the directors of which shall be appointed or elected, as prescribed by law. (§ 2.)

"The governor shall fill any vacancy that may occur in the offices aforesaid, until the next session of the legislature, and until a successor to his appointee shall be confirmed and qualified." (§ 3.)

Under these provisions it has been the practice in this state for the governor to make nominations to the senate and ask that they be confirmed, and then to issue certificates of appointment. Under this practice the governors have, from time to time, withdrawn from the consideration of the senate nominations made by them and not acted upon, and where appointments have been made during the recess of the senate the governor has sent the names of persons to fill those positions and at times has sent the names of persons other than the ones previously appointed.

It is suggested in the opinion that sections 1, 2 and 3 of article 7, of our constitution apply only to trustees of state institutions, but the practice has been the same between the governor and the senate in this state with all officers provided for by legislative enactments, whose appointments were to be made by the governor with the advice and consent of the senate, or where the appointments were to be confirmed by the senate. So, at the beginning of our government we adopted with reference to trustees of state institutions, at least, what was the federal rule with regard to this class of appointments, and as a matter of practice have continued it since that time. Certainly, it cannot be said that when the legislature provides that the trustees, regents, directors, or by whatever name called, of the state institutions shall be appointed by the governor with the advice and consent of the senate, following our constitutional requirement as to such officers and in harmony with the federal constitution and practice, that the legislature meant a different rule should apply for officers other than trustees of state institutions when it provided that their appointment should be made by and with the advice and consent of the senate. No such difference has existed between the governor and the senate in this state.

An examination of the senate journals shows how this matter has been regarded between the governor and the senate. The legislature of 1863, by chapter 43, provided for a board of directors of the state penitentiary to be appointed by the governor with the advice and consent of the senate. Governor Carney sent the following communication to the senate: "I hereby nominate, for confirmation, the following named gentlemen to constitute the board of directors of the state penitentiary." (S. J. 1863, p. 294.) By chapter 105 of

the Laws of 1864 the legislature provided for a board of regents for the state university to be appointed by the governor by and with the advice and consent of the senate and Governor Carney sent the following communication to the senate: "I herewith submit for your consideration the following nominations for regents of the state university." (S. J. 1864, p. 471.) In 1867 Governor Crawford sent the following communication to the senate: "I have the honor to transmit the following appointments and ask your confirmation of the same: Regents of the Kansas State University . . . commissioners to codify the laws . . . commissioners of irrigation . . ." The senate journal recites: "On motion the foregoing nominations were confirmed." In other communications to the senate Governor Crawford spoke of transmitting appointments and asking confirmation and the action of the senate referred to them as nominations. In 1869 Governor Harvey sent a communication to the senate (S. J. 1869, p. 627), and called attention to the fact that the then statute relating to the penitentiary took effect March 17, 1868, and that the directors for the penitentiary had been confirmed on March 3, fourteen days before the act took effect, and, in order to make the appointments legal, "I therefore submit the following nominations to the senate. . . . Before the session closes, I purpose to submit to the senate other appointments to fill existing vacancies, or to consummate such changes as may be thought necessary." The senate journal shows that the nominations made by the governor were voted upon separately upon roll call and all were confirmed except one. Two days later the governor submitted a number of names to the senate for various positions, stating: "I submit to the senate, for their confirmation, the following nominations." (S. J. 1869, p. 634.) The senate journal shows that some of the nominations were confirmed and some were not, the action being taken upon roll call. Governor George T. Anthony used the following form: "I respectfully present to your consideration the following nominations." (S. J. 1877, p. 774.) Governor St. John used the following form: "I have the honor to report the following appointments for your consideration and respectfully ask that they be confirmed." (S. J. 1879, p. 772, and S. J. 1881, pp. 661, 662.) Governor Glick used the following form: "I have the honor to make the following appointments for your consideration and respectfully ask that they be confirmed." (S. J. 1883, pp. 72, 290, 361, 491, 572, 614.) In each of these cases the senate action spoke of them as nominations and they were confirmed upon roll call.

Governor Stanley used the following form: "I have this day appointed . . . and herewith submit the same to your honorable body for confirmation" (S. J. 1899, p. 133, 150), and "I have this day nominated and transmit herewith for confirmation (pp. 659, 902). Governor Stubbs used the following form: "I herewith submit the following nominations for appointments in the public service, subject to your approval and confirmation." (S. J. 1909, p. 519.) And the same form is used at pages 567, 647, 734 and 846 (S. J. 1911), although at page 567 the word "appointments" is used instead of nominations. Governor Hodges used the following form: "I hereby submit the following nominations for appointment for the public service, subject to your approval and confirmation" (S. J. 1913, p. 46), and the same wording is used at pages 83, 664, 757, though at page 316 he used the word "appointments" instead of nominations. Governor Capper used the following form: "I respectfully submit the following nominations in the public service, subject to your approval and confirmation." The same form was used by Governor Allen. The communications also indicate that the governor withdrew names submitted to the senate before their action thereon at any time he desired. The records do not indicate any distinction in the communication of the various governors to the senate between trustees of the state institutions and other officers whose appointments are required to be confirmed by the senate. Frequently the names of nominees for trustees of state institutions and of nominees for other offices were contained in the same communication and acted upon by the senate in the same way. In many instances the records show that the nominations were acted upon on roll call and the yeas and nays entered in the journal, though in some instances they were acted upon in executive session and in a few cases they were acted upon in open senate without a roll call, the confirmations being unanimous.

From the above it seems clear to me that, so far as the steps to be taken for the appointment of officers to be appointed by the executive by and with the advice and consent of the senate, there is no difference between the federal rule and the rule in this state. After the various governors and senates of our state have for sixty years followed the practice of the federal government with reference to the appointment of those officers, to be appointed by the executive by and with the advice and consent of the senate, it seems to me we are rather late in discovering that a vital difference exists,

especially when we consider that the action of our governors and senates has been in harmony with article 7 of our constitution.

As to the length of time a person appointed to fill a vacancy during the recess of the senate may serve, there is a difference between the federal constitutional provision and the constitutional provision in this state. The federal constitution provides the president "shall have power to fill all vacancies that may happen during the recess of the senate by granting commissions which shall expire at the end of their next session." Our constitution provides: "The governor shall fill any vacancy that may occur in the offices aforesaid until the next session of the legislature and until a successor to his appointee shall be confirmed and qualified." (Art. 7, § 3.) This is the real distinction between the federal constitution and ours. By the federal constitution when the appointments are made in the recess of the senate to fill vacancies, the terms of the appointees expire at the end of the next session of the senate—. under our constitutional provision such appointee holds office until the next session of the legislature and until a successor shall be *confirmed* and *qualified.*

Applying our constitutional provision to the case of *Barrett v. Duff* now before us. There was a vacancy in the office of oil inspector caused by the resignation of Motter. The questions arising are, how and by what authority was the vacancy filled and what is the term of the appointee? The statute authorizing the appointment of oil inspector (Gen. Stat. 1915, § 5011) takes no cognizance of vacancies in that office and makes no provision for filling a vacancy, should one occur. Hence, it is of no aid to us in deciding the question presented. The majority opinion purports to find authority to fill this vacancy in section 3, of article 1, of our constitution, which provides: "The supreme executive power of the state shall be vested in a governor, who shall see that the laws are faithfully executed." But the authorities uniformly hold that such constitutional provision does not confer upon the governor the power to appoint officers, either for full terms or to fill vacancies. The only power the governor has to make official appointments is that conferred upon him by specific constitutional or statutory provisions, and that has been repeatedly recognized, both in our constitution and in our statutes. The only constitutional or statutory provision we have which authorizes the governor to appoint some one to fill a vacancy in the office of state oil inspector is sec-

tion 3 of article 7 of our constitution, which provides: "The governor shall fill any vacancy that may occur in the offices aforesaid, until the next session of the legislature, and until a successor to his appointee shall be confirmed and qualified." The point may be made that the office of state oil inspector is not one of the "offices aforesaid" named in this section, but a careful analysis of the matter will show that it properly falls in that class. Under this section Duff, having been appointed to fill the vacancy, holds until his successor has been confirmed and qualified. Barrett, never having been confirmed, is not entitled to the office. Hence, in this case, I concur in the judgment for the defendant.

The cases of *Goodrich v. Crawford* and *Rice v. Greenleaf* differ from the case just discussed in that theirs were full-term appointments. The statutes pertaining to appointments in these offices are similarly worded and clearly distinguish between full terms and vacancies. (See Laws 1920, ch. 29, § 1, and Laws 1921, ch. 260, § 1.) What has been heretofore said concerning the distinction between the federal rule and the law of this state concerning appointments to be made by the governor with the advice and consent of the senate, applies to these cases. As we have seen, there is, in fact, no difference. Where the statute provides that an appointment shall be made by the governor by and with the advice and consent of the senate, and the time the appointment should be made occurs in a recess of the senate, the authorities upon the status of an appointee naturally divide themselves into three groups as follows: The first group holds that the new appointee does not take the office until the senate meets and he is confirmed, and in the meantime the old officer holds over his term. These cases are based upon the doctrine that since the statute requires the concurrent action of the executive and the senate (or other confirmatory body) there is no appointment until such concurrent action is had. This rule could not apply, of course, to a newly created office when the first appointment is required by statute to be made when the senate would not be in session. Neither is it easily applied to a statute fixing definite lengths of successive terms of office which, by the statute, expire at a time when the senate is not in session. The second group of authorities hold that the governor should make the appointment at the beginning of the term, even though the senate be not then in session, but the appointment is only tentative and an *ad interim* appointment, and is not fully completed until confirmed by the senate.

Barrett v. Duff.

In such a situation the officer appointed takes the office at the beginning of the term. These cases are based upon the doctrine that the time having arrived for the appointment to be made, whether because a new office has been created or because of the expiration of the term of the old officer, it is the duty of the executive to make the appointment, but, since the statute requires confirmation of the senate, the appointee's right to hold the office for the full term never becomes complete until the appointment is confirmed. Under the authorities noted in both the first and second group above mentioned the executive may, at any time before confirmation by the senate, substitute another name for the person first named, or the senate may even, after confirmation and before a certificate has been issued by the executive, withdraw its confirmation. In other words, these authorities require concurrent action of the executive and the senate (or other confirmatory body) before the appointment becomes complete, and until such appointment does become complete, either the executive or the confirmatory body may withdraw its consent to such appointment. This is in accordance with the practice between the various governors and senates of this state as is definitely shown by an examination of the senate journals. The third group of authorities holds that the governor should make the appointment at the beginning of the term; that in so doing the governor exhausts his power and authority in the matter; that the appointee takes possession of the office and continues to hold the office for the full term unless the senate affirmatively rejects his appointment. The authorities of this group are not numerous and several of them are cited in the majority opinion. Whatever may be their virtue in the states where announced, they are not applicable in this state because not in conformity to the practice between the executive and the senate since our state was organized and for the further reason that under our constitution (art. 7) confirmation is an affirmative action requiring a roll call and that the yeas and nays be entered in the journal. In our state you can no more prove a confirmation by the senate by showing its lack of action than you could prove the passage of a bill by showing that it was never acted upon.

Defendants' rights to the offices were not strengthened by the procedure of the senate in procuring information of the recess appointments from the secretary of state and confirming them at a time when the governor's nomination of the plaintiffs was before

the senate for action. No authority is cited in support of this procedure. To the able argument in support of it, it is sufficient to say: where the statute requires an appointment to be made by the concurrent action of the executive and a confirmatory body, such concurrent action can not be established by showing that one of them consented to something which the other did not want to do. Obviously such a procedure is fundamentally unsound.

In these cases the governor sent to the senate the names of the plaintiffs, as he had a right to do under the authorities and under the practice that has existed in this state since its formation. The senate did not act upon them. After the legislature adjourned the governor appointed and commissioned plaintiffs for the unexpired terms and, in my judgment, they are clearly entitled to the offices.